Thank you for your support. My name is Whitney Cunningham. I'm with Dean Caldwell. Last we walked in to meet someone who lives down in Arizona. Mr. Cunningham, because you're such a law teacher, I'm going to have to slow it down. I'm sorry to judge you. With me today is my law partner, Jennifer Mott, at the table. And also with me is Joanne M. Lee, who is principal of J & J Rocket, which goes by the name of J.P. Consulting. There are three issues on appeal. There's a judgment on the pleadings as it concerns a restrictive covenant, a summary judgment as it concerns the affirmative defense on the breach of contract, and finally, the issue of attorney's fees. I don't intend to address the issue of attorney's fees. I'll rest on the brief unless the court has any questions about that. What I'd like to do is begin by discussing the summary judgment with regard to the breach of contract, because here we contend that the district court made an error in how it construed the quantum of evidence with which it had been presented and further had gone so far as to draw credibility determinations and to assign probative value to pieces of evidence which, rightfully, should have been left to a jury. The evidence of Ms. Caldwell's breach of loyalty and her breach of the duty of good faith and fair dealing in her employment relationship with J.P. Consultants begins with three things. First, she disclaims any duty of loyalty of any kind. She did this in her deposition. She was presented the opportunity to affirm or deny a duty of loyalty in an original written contract in subsequent contract dealings or employment dealings, and her answer was no, that there was none. Does that make any difference? It makes a huge difference. Well, let's assume there is one. I'm not sure there is one, but let's assume there is a duty of loyalty. What's your evidence of breach? In other words, whether or not somebody believes they have a duty doesn't really make any difference in the contract analysis. The question is whether they do, and if so, whether they breached it. So I'm not sure why your belief makes any difference. The district court made a similar argument suggesting that what she believed, whether rightly or wrongly, was her duty under the contract doesn't go so far as to tell us what she did or did not do under the contract. However, her conduct needs to be filtered through this lens of what she thought. Well, if you want to start with the first issue, she was an independent contractor, right? She was. Why do the duties apply, okay, to an independent contractor, to the person they contract with? The independent contractor, as agent of the principal, owes the duty. See, now you give mixed metaphors here. Independent contractors are never agents of the principal. They're independent contractors. It depends on the context of the employment relationship, but I think that both sides of this. Well, you're, again, mixing metaphors here. Let me just start with you. She is an independent contractor, correct? Yes. Okay. As an independent contractor, not an employee, not an agent, what are her duties to the person she contracts with? Her duties were defined in McAllister v. Costello, decided by both sides, as well as the district court indicating that she owes a duty of loyalty to the court. We point out in our brief that her status as an employee versus as an independent contractor really doesn't go to the heart of the matter in this case because she was hired to be the face of J&P Consultants in a very unique employment relationship in which only one person, Ms. Caldwell, served as the face of this company in Washington, D.C., working with agencies there to do leadership training. Ms. Pankey resides in Flagstaff, Arizona. Ms. Caldwell was entrusted to work on her own and to adequately represent the company in that capacity. So that's what she was hired to do, whether you call her an employee or an independent contractor. Let's get to this issue. What evidence is there that she didn't perform her duties as an independent contractor? We don't contend that she failed to perform her teaching or instructional duties. What we do contend is that she went beyond that and undermined the reputation of J&P Consultants. Tell me about the evidence. Okay. You see, I don't see anything. All I can find in this record is that she expressed an interest in maybe some import for the government agency, not the exact agency, but a sub-agency. So we see that she was performing her services. So it has a wrecked evidence of breaching the contract in this record. Yes, sir. It begins when she filed her first written complaint. She alleged that she had already been in discussions with the main client, Cedar, to provide services independently of J&P Consultants. Right. After the end of her service to J&P. Correct. I don't believe that's what the allegation says. She met with Joanne Pankey in January of 2013, at which time she told Joanne Pankey that she intended to compete. After the end of her service, the timing is unclear in that instance. But certainly you don't believe that the filing of the declaratory judgment action should breach the contract, do you? Isn't it appropriate to have a declaratory judgment action? Yes, the court was to contract provides. The declaratory judgment action was the straw in the cow's back in this case, but included the allegation by Ms. Caldwell, not only that she intended to compete, but that conversations to that end had already taken place. In addition to that, she acknowledged that she had already been in communication with people at Cedar to, quote, unquote, gauge interest, and whether there would be interest for her work. Now, she says that was in the context of seeking work at NIH and not Indian Health Services. Well, her decision was to stay at agency at Cedar, but she allows the use of an independent contractor with your client. She talks to the agency and says, at some point I'm going to have to get to work for you, correct? Yes. Any of the so far as I can read this record, you would like most favorable to your client. That's what you've got. That's not even the most important piece of evidence. The most important evidence is Ms. Caldwell's admission that she was in intimate conversations and communications with Ms. Newcomb, who was the principal. No, I understand. But no matter how you characterize this, let me know what more you've got. She was talking to the client about possibly somebody coming to work for her, correct? Yes. Anything else? Yes. She was undermining the reputation of JP Goodsout by fighting with, as Newcomb asked, two plans for negotiating her contract, the history of those negotiations, her complaints about the fact that she had apparently signed a non-compete agreement, enforceable or not, to the point where she was receiving advice from Ms. Newcomb about what she ought to do about that. Go hire a lawyer. Not only for advice, Judge Steiler, but also for moral support, essentially turning this relationship in which she was hired to be our face, JP Consultants' face, with the client into one strictly for her own benefit. All now filtered through the lens of the fact that she believed she had no duty of loyalty or obligation to her employer, and that she was already in conversations with people that already approached her about providing competing services. When summary judgment motions were argued, did you provide evidence of damage? No, Your Honor. We did not make a counterclaim. This is an affirmative defense. Oh, I understand. Yeah. Did you provide evidence of damage at the time? No. No, we did not. No, we did not. And I take it the record doesn't disclose whether or not your client loves these countries. That's correct. It's not an affirmative defense. Did you, in fact, submit to your court and detention department whether any issues that may have been made were tried under your effect? Yes, Judge Steiler. What we did was we took the specific instances of conduct by Ms. Caldwell, and I believe it's on page six of our response to the motion for summary judgment, where we attempted to walk the district court through the specific acts, the specific pieces of conduct, and why we believe that reasonable jurors could find that there was a derogation of her contractual, implied or expressed obligations to GP consultants. Let me phrase that. The fact is, I assume we have an independent contractor, a flyer, used to work for a client, part of the law firm, and the flyer says to the client, you know, I'd really like to come to the house with you someday. I think I could do the same work for you more cheaply. If I were in the house, the deputy would reach for it. And the attorney-client situation, the term of the answer would be no. So let's make it somebody else. You continually call a plumber into your home to fix it. A plumber works for a company, and the plumber says, I'm going to get it going on my own. Would you call me if I were on my own? Okay. No. That would be a breach of the duty of loyalty, and that's the McAllister case, while employed to provide services for GP consultants. I keep making it at least an independent contractor. You keep saying employee. I want to go back to an independent contractor. I don't think the McAllister case draws that distinction. The McAllister case is often an independent contractor. No. The McAllister case was a commercial real estate broker who decided to start her own business. And in that case, she sent out a letter basically saying, Hey, everyone, I'm going to be resigning and starting my own business. But she was an employee of a consultant. She was. So can you just address for me, because I'm having a misdemeanor, because it makes a difference to me in this case, is there a difference between the duties of an employee and those of an employee? Judge, I think the generic answer to that is yes. However, in this case, what you have to take a look at is what were the specific duties for which Ms. Caldwell was engaged, and she was placed in a position of high trust. This is one of the reasons why in the brief, we did spend a lot of time focusing on provision of the agreement between the two parties. There's a divergence of understanding of exactly what the agreement was, but what seems pretty clear was that there were express conversations about the fact that Ms. Caldwell owed a very high duty of professionalness in undertaking these services on behalf of people and consultants, because in the end of the contract, you're being allowed to do what you want to do. Of course, yes. And so she was allowed to do her thing. Not to herself at the expense of J.P. consultants, and that's what had occurred here. And Ms. Caldwell herself admitted in that position that she owed the utmost high degree of professionalism as she carried out her job for J.P. consultants. And our position is that in the amalgam, when you take all of this evidence, the fact that she disclaimed a duty, the fact that she was already in conversations, the fact that she fully intended to compete irrespective of when, and then you look at the other actions that she did, the sending of emails and the phone calls with a wink and a nod, saying, hey, I'm looking for business, maybe at another agency. But really the heart of the matter is her communications with Snookum, where she basically endeared herself to Snookum, saying, look at how unfairly I'm being treated here. You know, what should we do? That's the breach of contract. It's the speech. She didn't do any work for the people here. That is pertinent. So your claim is more information claim than anything else, right? The question, as we frame it, is, is an employer, is an employer required under these circumstances to suffer an employee like this or an independent contractor, to suffer an agent or independent contractor actively harming the communication of the employer and setting herself up to compete in a way that is an altercation with Snookum? What I saw in there, I think, was statements that I may be leaving this company, and I want to know if you'd be interested sometime in my employment, in me as an independent contractor. I mean, does that necessarily, do you see any resistance in recognition of an existing employer? Yes, Tammy, if that were the statement, it would not have defeated the relationship, but there were numerous other statements that are set forth in the record and some e-mails that do exactly that, that harm the reputation of J.P. Consultants, and that's where she fell, and that's where we believe we were justified in terminating that relationship. You only have a minute and a half left, and in the second part of your case, which is the restrictive covenant, let me just ask you one very direct question. Do you find in a Arizona case in which a three-year, forget the geographic condition, in which a three-year restrictive covenant was held with respect to an employee, you may put aside an independent contractor. The answer to Troy's is sort of, in the Oliver Pulcher versus Daniels case, that's a 1986 Supreme Court one-bank case. We had a three-year reach, a statewide reach. Now, in that case, the Court of Appeals upheld the restrictive covenant. The Supreme Court struck down the restrictive covenant on the geographic reach basis, claiming that it was too broad. The Supreme Court did not discuss or touch the three-year reach. So there's no, is there any Arizona? If there's any Arizona Supreme Court case, that will take a three-year covenant. Not that I'm aware of. And there's two, what I see here are really two lines of jurisprudence. The state courts in Arizona abiding the Farber decision, which says these are intensely factual matters and need to be examined, which is why we believe they're not appropriate. But again, I want to be clear. For a 20-year covenant, we want very good facts. Well, I don't think so. There is some number that exceeds any number by the Arizona courts. And so I'm trying to figure out whether this will just fit in that pattern. There's no bright line, Your Honor, in justice. I can't cite you, but there are bright lines. Surely we would throw out a covenant. It seems for the rest of your life you haven't had a word for anybody. I can't find a bright line in the state of Arizona, instead of what I find is the guidance of Farber that says these are very factual investigations that have to be considered on their merits. That doesn't indicate, the case law say, and I understand this was on occasion, is that you can only have a covenant for an employee for as long as it takes to find an employee. That's the general statement that comes from the 1960 Farber Law Review article by Harlan. Yeah. It comes from the Arizona case. The point I was going to make is that in that article, it goes on to say in a more complex employment relationship, a longer period of time may be required. And that's only on the issue of replacing the employee. There's also the issue of protecting the confidential information, which is why in this case the fact that this covenant was restricted to only those clients of J.P. Consultants, the temporal limitation might well be reasonable. You see, they never had an opportunity to test it. I'm going to be taking the overtime. We'll keep you in the different room. Thank you. And please record, David, that you're seeing on behalf of the appointed faculty, Debra Cobo. To address a few of the points that were just discussed in the council argument. The McAllister case clearly was an employment case. But even in that case, in that case, the employee, while still employed, reached out to the clients of the employer and said, I'm leaving and I'm going to start my own business. Engaged interest in the potential of future business after the end of the employment is really no different than what occurred here at best. And the evidence at best for J.P. Consultants. On your issue regarding whether an independent contractor has a fiduciary duty, they don't. Well, except that there are some issues. Mr. Cunningham says, not only did your client say, I'm thinking of starting my own business, and I didn't engage interest in that. But she said, the reason I'm doing so is my current employer is a terrible person. And so focus on that for a second. Tell me what the record shows you. The record doesn't show any statements by attitude. If you dig down, because what you see is in the brief, they actually only cite their statement of facts, which then, in essence, additions to the record. If you go to the record, there's no concrete evidence of any statement giving any sort of negative findings to J.P. Consultants. The testimony that they rely on to assert that this Caldwell made statements is actually Ms. Pinky's testimony, that she perceived her relationship deteriorated and jumped to the conclusion that it was because they were called on the record. I remember there is no concrete evidence. Well, I was trying to find the notes. May I ask you a different question? Were there conversations with the federal agency about the restrictive covenant? Were there conversations? It was basically Mr. Pinky. Actually, Ms. Pinky, in January of 2013, which precipitated the finding of the death penalty, reached out and told the agency, because Deborah Caldwell had indicated to Ms. Pinky. Yes, exactly. And so Joe and Pinky reached out to the agency and said, she will not be able to work with you until October or November of 2014, which was three years after the end of the original hearing. And so that issue had already been raised by Ms. Pinky. What did your client say to the agency about the restrictive covenant? When you're looking at the record, I'm sure you find anything. Did she indicate her intention to litigate it or find it? She certainly gave them notice that she had, when she filed the death tax claim, which was then before she had finished, she let them know that that was occurring. Yes, for sure that happened. I believe that's all this is. She doesn't know. I don't think there's any evidence that could be interpreted that way. In their best case, the fact that Ms. Caldwell shared the status of her employment agreement is what they would argue was that. But in fact, the reason that was necessary was because back in October of 2012, Joe and Pinky had notified Ms. Caldwell that she was terminating the agreement effective at the end of October of 2012. They then notified the agency. So Ms. Caldwell, when they struck the email deal October 23rd, had kept the agency apprised, okay, it looks like I'm actually going to keep working after October 26th. And so that was keeping them abreast of the fact of what was happening and the fact that they were continuing to work. It wasn't anything disparaging or negative towards J.P. Consultants. And, in fact, the only evidence is the evidence of Ms. Muguru and Ms. Giroux, two of the agency representatives, who said she never said anything negative about J.P. Consultants. And that's every time for her to be corrected, because Ms. Muguru and Ms. Caldwell testified consistently about the agreement. Okay, thank you. Would you address, I mean, I don't want to take you to that whole other point, but on the restrictive covenant issue, it was a judgment on the J.P. Consultants. Correct. So we have to be able to conclude that a covenant is faced. Correct. Because there's no factual allegations other than the fact that I had this covenant and I had this contract. There are some factual allegations. In fact, we pled, we tried, we filed this with the intent of knowing what they brought on the office. Actually, factual allegations. I'm sorry. On the face of the complaint and the answer. Yes, okay. Yes, sir. Thank you. How can we conclude on the face of the complaint and the answer, that this is an unenforceable covenant? Because there is no way a three-year non-competing Arizona, based on all of the cases we've had over the last 60 years, there's no circumstance where that would be enforceable, particularly in light of the fact that this was a one-year agreement that immediately imposed a three-year non-competing, when the standard is what it would take for an employee, or excuse me, for an employer, and they can only, they're strictly construed, and they can only be as long as necessary for the employer to protect its legitimately protectable interest. And that means finding an employee and getting them up there, or a contractor and getting them up to speed to be able to compete fairly. That's the idea. And that's what we have to do as courts, you know, in determining that as a matter of law, as opposed to on a record. In other words, you're saying there can't be no circumstance, no conceivable circumstance, in which a three-year covenant for an employee, let's say that you had a contractor, which is a three-year covenant would be sustained by their human rights under these circumstances. Well, also, when you start to talk about under these circumstances, they're only the ones on the face of the complaint, which is that she had a one-year agreement to provide them. It's not, we can't figure out how long it would take to hire somebody to do that because there's not a record. We can't, we don't know whether there are other people around who do these jobs or don't do these jobs. So your position has to be that if you have a one-year agreement and a three-year covenant, it's this thing that enforces it. Well, correct. In some rises and circumstances, I'm only talking about the facts of the complaint, but if you go to the complaint, there are facts there. And so I think that could be the case on Arizona. Facts admitted. Correct. Correct. Absolutely. And this is a unique posture, no doubt, because my client exceedingly conscientiously, and I like the most common scenario for an employee, actually decided, you know what, I'm not going to just ignore a non-compete that I believe is going to pass the report and make sure they think it's what it was. No, I. I just want to add to that. Your message was, I'm sure you had a lot of conversations. Well, I signed up for that. There were several cases in my brief that, you know, lay out the fact that a two or three, anything over two is going to be unenforceable. So do you think it is a per se rule in Arizona that restricts your covenant, that exists in two years from now, where it practically exists, is not enforced? Correct. Practically. You made me argue that I take it from the absence of any cases. I'm hoping what it's opposed to from the absence of any cases is the same. That's correct. I would say that's correct. It's on pages 21 and 22 of my brief. So Malik Medical Specialist was a three-year. Reisling was two-year. MX Distribute was three-year. Lesser Dental Labs was two years. By the way, that was decided on the pleadings on the 12th. And there's one additional case, by the way, that between the time when the restrictive covenant ruling by the district court and our appeals brief, there should have been included, which was the more than appeals decision to work with communications unlimited, which is 233 Arizona. And if you want us to consider the case, would you file a 28 case? It doesn't offer anything new to us, but it is another example of a case that was on the pleadings, 12B6, and in that case, which factually, again, it was on the pleadings, so it's only the facts that were in the pleadings. Let me ask you about the geographic scope issue here. This really isn't a national restrictive covenant. It's restricted to some specific clients, but it doesn't prevent your clients from competing nationally, I guess, against JJ, JP, I don't know what they're called. Well, it is national. The geographic scope is national because if you look at it. It's client specific, is it not? It is client specific. So that's very different than saying you can't work anywhere in the country for anybody. If you can't work for these specific clients you're looking for when you're here. That's true. But it's still too broad geographically because you compare that to in any of the pleadings. It is set out in. See, so let's assume, that's why I'm asking you for a covenant. Let's assume we had a restrictive covenant that was reasonable in tone. For the next six months, you may not work with these specific clients. We wouldn't treat this as a reasonable thing. As Steve can't work in the country, he's a professional for six months. We would say there's a very narrowly defined group of clients for whom you won't work for a reasonably short period of time. I don't think that's a capacity. Well, you're all right. I'm not sure if maybe we're viewing the term national in two different ways. But to me, it's whatever the geography is. And I agree that there is a distinction to be drawn between a non-compete that limits it to clients, but it's national versus one that says, you can't do this anymore. Well, there's no evidence, for example, that these clients, because we're in the pleadings, do business in 50 states. Well, according to J.P. Consultants, the, the, well, in the agreement that's actually incorporated into the pleadings, there is a reference to, this is how they ask the court to define clients. It's on page one of the PSA, the Professional Services Agreement, which is attached to the complaint, and admittedly authentic. That it's the FDA and the Indian Health Services and related agencies nationwide. That is how they want the term client defined and what they believe, how that term is defined in the agreement. That is a reference from the agreement itself. And so they actually would take the position that, yes, any agencies of the FDA, the Indian Health Services, and related agencies nationwide, which is how they get their force, unenforceable on that basis. But your honor, one of the key, key elements here is, there's no dispute that this was all, well, only worked for the Center for Drug Evaluation and Research, which is one of nine sub-agencies of the Office of Medical Products at PACO, which is one of four directorates of the FDA. And the IHS. Those are the two. They probably would have run in that way with the blue pencil. There were two things. The blue pencil, because you couldn't get FDA down to Cedars through the blue pencil process. Because it says FDA and IHS and related agencies. So we'd have to, we'd have to invite in the related agency. As you know, it's been cutting out the FDA. If you blew the pencil, then you could get it down to IHS. But there's never been any allegation that she did anything, or I suppose. So they could have IHS anywhere. And I would argue that's still unenforceable, because she only did them. That's what I'm pointing to. Thank you. One of the problems with this case is people keep going back and forth between claims and assembly judgment. One of the critical issues, we've already hit upon this a little bit when we were reviewing the motion for summary judgment issues. We've got to dig down to what actually the evidence in the record was, because that's what the district court did. He didn't determine credibility. He determined what the actual concrete evidence supported, because it's inconsistent with what's been asserted by J.P. Holmes at the district court level and at the court of appeals level. And when you dig down to that, there's no basis, no factual basis upon which a jury can conclude that it's called off material in the British state agreement. We think the, at a minimum, the restrictive covenant is unenforceable based on the three year time frame. And on that point, by the way, J.P. Consumers had every opportunity to come up with some hypothetical situation to show the court that there is a circumstance consistent with what was pledged under which this could be enforceable. They didn't do it because providing any support or even a hypothetical situation, they could support that because there is a point. Because under Arizona law, it's that clear. And while, yes, there's, you can rely on the general principle, or they can rely on the general principle that it's a totality of circumstances. It's uniquely clear based on Arizona case law that this three year, with no geographical restriction, would not be enforceable. And that's what the district court allowed. If the covenant is unenforceable, then they could not get a wager from another bank. Those things go together. They're independent. In fact, the restrictive covenant was a previous agreement, not the actual agreement in place at the time of the undetermined issue. Thank you. Thank you. Mr. Cunningham, we used to put your time up with questions. Why don't we give you a minute for a moment? Thank you, Your Honor. That's generous. It bears noting now that opposing counsel and I, today, have spent more time in court on this case than all prior times and come to today. This case, we were provided oral argument, one impromptu oral argument on the motion for judgment on the pleadings. And so what happened was the district court took it upon itself to find a way to move along the covenants without letting the jury do that. As it concerns the restrictive covenant, none of the cases cited to you, save one, allow that to occur at the pleading stage. Not Lester, neither did Lester. There was a show cause period in which evidence was developed. The only case in which it was done was Swope. And in that case, only because the court found that it was redundant with other covenants that went on in that case. Yes, Your Honor. One question about that. Is there a difference between doing a judgment at the pleading stage as 12B-6? Doesn't the 12C give you a bigger, potentially a better position than the 12B-6? So it should have put us in a better position. But, in fact, it didn't. But there's plenty of Arizona cases doing it as 12B-6. Yes, sir. Yes, sir. So you get the advantage of the 12C. You get the advantage through denial, so you enhance it, don't you? In theory, it would be more supposed to. But I don't think that's what that's for. You may have been wrong, but I'm just trying to look at this procedure thing. There's lots of Arizona cases that say you can do it in a 12B-6 stage, and certainly you can do it in a 12C stage. Well, I know I'm out of time. You can't develop the facts at a 12 stage. Fair enough. But there are some cases that uphold striking that covenant. So it's a 12B-6 stage, but that's pretty good. Thank you. Thank you both for your very helpful arguments, Ms. Casey. Thank you both for coming here for Arizona. Thank you.
judges: Siler, Canby, Hurwitz